## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ALAN SIMONS, | : | C.A. NO. 2:21-cv-00129-CMR |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| BUCHANAN INGERSOLL & ROONEY PC, | : |  |
| and ROYER COOPER COHEN BRAUNFELD | : |  |
| LLC, | : |  |
| Defendants. | : |  |

## DEFENDANT BUCHANAN INGERSOLL & ROONEY PC'S
## <u>MOTION TO DISMISS THE COMPLAINT</u>

Defendant Buchanan Ingersoll & Rooney PC moves the Court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint of Plaintiff Alan Simons in its entirety and with prejudice. The grounds for this Motion are set forth in the attached supporting Memorandum of Law.

Dated: February 3, 2021

Respectfully submitted,

*/s/ Craig D. Mills*
Craig D. Mills (PA ID No. 81331)
Andrew G. Hope (PA ID No. 317932)
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 S. 16th Street, Ste 3200
Philadelphia, PA 19102
T:  (215) 665-8700
F:  (215) 665-8760
E:  craig.mills@bipc.com
    andrew.hope@bipc.com

*Attorneys for Buchanan Ingersoll & Rooney PC*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

|  |  |  |
|---|---|---|
| ALAN SIMONS, | : | C.A. NO. 2:21-cv-00129-CMR |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BUCHANAN INGERSOLL & ROONEY PC, | : | |
| and ROYER COOPER COHEN BRAUNFELD | : | |
| LLC, | : | |
| Defendants. | : | |

---

**DEFENDANT BUCHANAN INGERSOLL & ROONEY PC'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Buchanan Ingersoll & Rooney PC ("Buchanan"), by its undersigned counsel, respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Complaint of Plaintiff Alan Simons ("Simons").

**INTRODUCTION**

This is a legal malpractice case, brought by Plaintiff Simons against Buchanan and another law firm, both and neither of which Simons claims represented him in a 2015 business transaction. In fact, Buchanan has never represented Simons, certainly did not represent him regarding the contract amendment at issue, and even if it had (which it did not), the alleged amendment did not change the structure of the agreement in a way to harm Simons. There is not a single element of this case that is based upon any meritorious duty, breach or damages, and it is filed beyond the applicable statute of limitations.

**BACKGROUND AND PROCEDURAL HISTORY**

Prior to 2006, Simons was the owner of RDS Vending, LLC ("RDS"), and Buchanan had no relationship with Simons or RDS. In late 2006, Buchanan's client John Brown ("Brown"),

bought a 50% interest in RDS.  Buchanan represented Brown in that acquisition, and Simons was represented by separate counsel.  As part of the acquisition, Brown and Simons signed a "Put-Call Agreement" in early 2007 that gave Simons the right to "put" his remaining 50% interest in RDS to Brown to force Brown to buy him out, and gave Brown the right to "call" Simons' share of RDS to force Simons to sell.  The language of the Put-Call Agreement established rather complex and variable periods of time when Simons could exercise his put rights, and differing periods when Brown could exercise his call rights.  The Put-Call Agreement also set complex and varying valuation dates which also differed between the put rights and the call rights.  There is no question Brown was represented by Buchanan in connection with the Put-Call Agreement in 2006-07, and that Simons was represented by separate counsel.

After the acquisition, Simons continued to serve as president of RDS and run the business, while Brown remained a relatively passive participant, concentrating his attention on other companies that he owns and operates.  Buchanan continued to represent Brown in a variety of matters regarding these other businesses.  In addition, Buchanan was retained by RDS – not Simons individually – in two specific, finite matters wholly unrelated to the Put-Call Agreement.  Buchanan's engagement letter expressly provided that it was ***not*** representing Simons individually.  Buchanan has never been engaged to represent Simons and never did.

In the original Put-Call Agreement, Simons' Put Period had a flexible start date[1] but a Valuation Date that was fixed as the date the Put Period started.  The agreement also set the start of Brown's Call Period with a flexible start date[2] but a Valuation Date that was not fixed as of

---

[1] The start date for the Put Period was the earliest of four different events.

[2] The start date for the Call Period was also the earliest of four events, but not the same four events as applicable to the Put Period.

the date the Call Period started.  The Valuation Date for the Call Period was "the date that the Call Option is exercised."  *See* Compl., Ex. 1 at paragraphs 2 and 3.

This distinction in the original Put-Call Agreement between the fixed Valuation Date for Simons' Put Option versus the flexible Valuation Date for Brown's Call Option (negotiated at a time when Simons admits he was not represented by Buchanan) is critical.  From the very beginning, the Valuation Date of Simons' put was not variable to the date he elected to exercise it (as was Brown's Valuation Date for his call).  In the original Put-Call Agreement, if Simons continued to work at RDS beyond the third anniversary of that Agreement, his Put Period extended to the fifth year, but the Valuation Date remained the start of the Put Period or the third anniversary (1/2/10).

The Put-Call Agreement was modified on three occasions - Amendment I on June 30, 2011, Amendment II on December 3, 2015 and Amendment III on April 12, 2016.[3]  Each of these Amendments was necessitated by the parties' desire to extend the original put and call periods in the Put-Call Agreement because Simons continued to extend his employment with RDS beyond the three- to five-year period the parties originally contemplated when Brown bought into RDS in 2007.  In each Amendment, the language tracked the original structure, and the original disparity between the inflexibility of the Valuation Date for the Put Option and the flexibility of the Valuation Date for the Call Option was preserved and accepted by the parties. For Amendment I in 2011, Buchanan represented Brown and Simons admits he was represented by separate counsel.  At that time, Buchanan had not yet even been engaged to represent RDS in any matter.  Amendment I was signed on June 30, 2011 which was six months *after* the start of the Put Period (January 1, 2011) so the Valuation Date for the Put Option was fixed as of

---

[3] The substance of the change in Amendment III is not relevant to this dispute.

January 1, 2011 when Amendment I was signed. However, the Valuation Date for the Call Option remained variable to "the date the Call Option is exercised." *See* Compl., Ex. 2 at amended paragraphs 2 and 3.

Between Amendment I (6/30/11) and Amendment II (12/3/15), Simons continued to run RDS, Buchanan continued to represent Brown, and in two finite matters (described below), Buchanan was engaged to represent RDS (not Simons).

For Amendment II, Buchanan represented Brown and not Simons. Buchanan's communications regarding Amendment II were exclusively with Brown. Buchanan had no communication with Simons regarding Amendment II. Rather, Simons consulted and communicated solely with lawyers at Royer Cooper Cohen Braunfeld LLC, the other defendant in this action, with regard to Amendment II. Simons was plainly aware that Buchanan was representing Brown and not him on Amendment II, as is obvious from the November 2015 emails attached to the Complaint showing that Buchanan attorneys were advising Brown, and not Simons, regarding Amendment II. *See* Compl., Ex. 7.

Amendment II (12/3/15), like Amendment I, tracked the language of the original Put-Call Agreement. Though Amendment II extended the Put and Call Periods, Amendment II preserved the Valuation Date distinction. For the Put Option, the Valuation Date remained fixed at the start of the Put Period, which was December 3, 2015, but the Valuation Date for the Call Option remained variable to "the date the Call Option is exercised." *See* Compl., Ex. 8 at amended paragraphs 2 and 3.

Simons and Brown also negotiated into Amendment II additional benefits for themselves. Amendment II provided Brown a 12 month period to close on the purchase of Simons' 50%

interest after Simons put his shares to Brown ("Brown's Close Date")[4].  And, Amendment II provided Simons with the benefit of receiving the higher valuation for his shares between a Valuation Date of 12/3/15 (which, as of that date, had been RDS's best year) and Brown's Close Date.  This provided Simons with the benefit of having a "floor" value for his shares based upon 2015 numbers (a great year) but also the potential to gain any upside in value increase that occurred as of Brown's Close Date.

Amendment III was signed in April 2016, just months after Amendment II.  Though the substance of this change is not relevant here, it is relevant that, like the Put-Call Agreement and Amendments I and II, Buchanan did not represent nor have any communications with Simons with regard to Amendment III.  Buchanan's only communications regarding Amendment III were with Brown.  It is also relevant that Amendment III involved the same paragraphs at issue here (paragraphs 2 and 3 to the Put-Call Agreement), which again highlighted for Simons the language he now finds offensive as far back as April 2016.

**<u>Simons Mis-Times His Put to Brown</u>**

For years after signing Amendment II, Simons held his remaining 50% share in RDS and his position as its sole Manager, electing to earn millions in dividends and salary, instead of selling out by putting his shares to Brown.  In late 2018, Brown discovered that Simons had also been incentivized not to sell out his interest because Simons had been abusing his powers as Manager to enrich himself and his family.  In March of 2019, after Brown complained of this mismanagement and demanded an independent audit of RDS's finances, Simons filed a surprise arbitration demand against Brown (the "Arbitration").  In the Arbitration, Simons unsuccessfully sought to avoid further scrutiny of his mismanagement by voiding Brown's call rights under the

---

[4] The value of RDS had grown to the point that Brown wanted to ensure he had sufficient time to obtain financing if needed.

Put-Call Agreement.  These sham claims were dismissed by AAA Arbitrator Judy Weintraub in October 2019, and Simons' petition to overturn the Arbitration award in Brown's favor was denied by Judge Gerald McHugh of the United States District Court for the Eastern District of Pennsylvania, who confirmed the award in March 2020.  Simons' meritless appeal of Judge McHugh's decision is currently pending in the United States Court of Appeals for the Third Circuit.

In the midst of Simons' repeatedly failing attempts to deny Brown his call rights through the Arbitration and appeals, Simons abruptly changed course and put his shares to Brown on March 17, 2020 (the "Put Notice").  The Put Notice was delivered to Buchanan, as counsel for Brown, by Simons' counsel George Bochetto, Esq., who also represents Simons in the Arbitration (but not, interestingly, in this malpractice action).  *See* Compl. ¶¶ 47-49.  The effect of the Put Notice is to require Brown to buy Simons' 50% share in RDS no later than one year after the notice (March 17, 2021).  The Put Notice is irrevocable.

Simons' about-face decision to issue the Put Notice on March 17, 2020 was designed to be a bold, strategic ploy to force Brown to buy out Simons' 50% interest based on RDS's revenues for 2019 value, which Simons rightly anticipated would be much higher than the COVID-impacted 2020 revenues.[5]  However, the strategy backfired because it was premised entirely upon Simons' (and Bochetto's) misreading or misunderstanding of the Valuation Date terms that really had not changed  in substance since 2007.

In delivering his Put Notice in March 2017, Simons forgot or perhaps never understood that since 2007, the Valuation Date for the Put Option was very different than the Valuation Date for the Call Option.  The Valuation Date for the Put Option was fixed as of the start of the Put

---

[5] Per the agreement, the value was based upon the 12-month period ending on the last day of the calendar quarter before the Valuation Date.

Period which, per Amendment II, was 12/3/15.  Due to Simons' misunderstanding of the timing of the Valuation Date for the Put Option in the Put-Call Agreement and subsequent Amendments, he mistakenly thought he had the ability to manipulate the Valuation Date in sync with his Put Notice date.  But, per the terms of the Put-Call Agreement, he had not had that ability since January 1, 2010.

Also, because of Amendment II, Brown was not forced to close immediately on Simons' shares; Brown had 12 months to prepare for Brown's Close Date.  After failed negotiations to agree on a valuation date, Brown informed Simons Brown's Close Date would occur in September 2020.  Per Amendment II, the value for Simons' shares would therefore be the higher of RDS's value as of 12/3/15 or September 7, 2020 – not the value as of the date of Simon's Put Notice (3/17/20) that Simons had mistakenly targeted.

Simons' incorrect assumption that he could peg the Valuation Date for the Put Option as the same date as his Put Notice led him to believe that he would realize a higher valuation for his ownership interest.  However, per the Put-Call Agreement, the Valuation Date was fixed as the higher value for RDS between a Valuation Date of December 3, 2015 or September 7, 2020.  Despite the timing of the Put Notice, Simons' Valuation Date for his 50% interest is not calculated based on RDS's 2019 revenues.

After delivering his gaffe-induced Put Notice, Simons retained the law firm of Cozen O'Connor to represent him in finalizing the Put Purchase Price and drafting the release under which Brown would purchase his shares.  Brown, again represented by Buchanan, apprised Simons' counsel that the Valuation Date he had targeted was incorrect and proposed a Put Purchase Price calculated based upon that (correct) date.  Outraged to find that he and his counsel had employed an errant strategy in putting his shares to Brown based upon their

incorrect reading of the Put-Call Agreement, Simons retained yet another lawyer, Paul Rosen, Esq., to file this action, claiming for the first time that Buchanan's representation of Brown in connection with the Put-Call Agreement represented a conflict of interest. Essentially, stinging from shooting himself in his own foot – or being shot by his then-counsel – Simons now struggles to find someone else to blame.

### Buchanan's Representation of Brown and Lack of Representation of Simons

Buchanan has never represented Alan Simons individually in any matter whatsoever. On the contrary, Buchanan represented Brown and was adverse to Simons in the drafting of the original Put-Call Agreements and each of the Amendments thereto. *See* Compl., Exs. 1, 2, 7, 8. In fact, in the Arbitration, initiated by Simons in October 2019 and still ongoing, which is exclusively focused upon Simons' and Brown's Put and Call rights under the Put-Call Agreement, Simons has never once claimed Buchanan had represented him or raised an objection to Buchanan's representation of Brown adverse to Simons even though that case has gone through the AAA proceedings, federal District Court and is now at the Third Circuit. Simons has never signed an engagement letter in which he retained Buchanan to represent him personally. He has never paid any invoice issued by Buchanan for legal services with his own funds. He has never privately consulted, conferred or communicated with any Buchanan attorney about any legal matter separate and apart from Brown. Thus, Buchanan has never represented Simons individually in any matter, specifically including the drafting of the Put-Call Agreement and its Amendments.

In 2012 and 2013, Simons, as manager of RDS, did retain Buchanan to represent RDS in two commercial matters: the formation of an affiliated company, Rite-Vend, LLC, and the potential formation of a second affiliate, Regal Vending, LLC. Neither of these matters had

anything to do with the Put-Call Agreement, its Amendments or the parties' rights thereunder. Buchanan billed its time on the Rite-Vend transaction under a client matter number assigned to Brown, and addressed its invoices to RDS for payment.  RDS, not Simons, paid those bills.  All communications between Buchanan and RDS regarding the Rite-Vend formation included both Brown and Simons as co-owners of the company.  No separate or confidential discussions occurred between Buchanan and Simons.   The engagement letter in the Regal Vending matter, as signed by Simons himself, expressly states that Buchanan represented RDS only in that engagement, and ***not*** Simons or any of the individual members of RDS.  *See* Compl., Ex. 3. Once again, all of Buchanan's invoices for its work on the proposed Regal Vending project, which never came to fruition, were addressed to and paid by RDS.

Since early 2019, Buchanan has also represented Brown and been adverse to Simons in an action currently pending in the Philadelphia Court of Common Pleas in which Brown seeks recovery for Simons' self-dealing, misappropriations and mismanagement of RDS (the "CCP Action").  As in the Arbitration adverse to Brown, Simons is represented in the CCP Action by Mr. Bochetto.  In the CCP Action, Simons waited until 13 months after suit was filed before moving to disqualify Buchanan on the baseless allegation that Buchanan had represented him personally in connection with the Rite-Vend and Regal Vending commercial transactions – ***not*** the Put-Call Agreement or any of its Amendments.  Tellingly, when that motion to disqualify came on for a hearing before Judge Wright-Padilla on September 20, 2020, Bochetto ignominiously withdrew the motion, citing a lack of supporting evidence.

In bringing this legal malpractice action, Simons improperly seeks recovery from a law firm that never represented him.  As explained below, even if Buchanan did represent Simons,

which it did not, the claims at issue should nevertheless still be dismissed as time barred and for failure to plead any breach or causation of damages.

## ARGUMENT

### I.      Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although the Court must accept all well-pleaded facts as true and draw reasonable inferences in favor of the plaintiff, it need not accept legal conclusions masquerading as facts. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).  In addition, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). To state a plausible claim, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

### II.      The Complaint Should Be Dismissed as Time Barred

While the essence of Simons' claim is legal malpractice, he asserts three alternative theories of recovery: breach of fiduciary duty (Count I), professional negligence (Count II) and breach of contract (Count III).  Under Pennsylvania law, the statute of limitations for breach of fiduciary duty and professional negligence is two years. *Edwards v. Duane, Morris & Heckscher, LLP*, 2002 U.S. Dist. LEXIS 16301, at *14 (E.D. Pa. Aug. 7, 2002); *ASTech Int'l,*

*LLC v. Husick*, 676 F. Supp. 2d 389, 396-97 (E.D. Pa. 2009).  The statute of limitations for breach of contract actions is four years.  *Edwards*, 2002 U.S. Dist. LEXIS 16301, at *16.

Pennsylvania favors strict application of the statutes of limitation.  *Wachovia Bank, N.A. v. Ferretti*, 935 A2d 565, 572 (Pa. Super. Ct. 2007).  "[T]he trigger for the accrual of a legal malpractice action is not the realization of actual loss, but the occurrence of a breach of duty."  *Ross v. Meyer*, No. 12-0998, 2014 U.S. Dist. LEXIS 83349, at *35 (E.D. Pa. June 19, 2014).  When the issue of whether the statute of limitations has run involves a factual determination, the determination is for the jury.  *Edwards*, 2002 U.S. Dist. LEXIS 16301, at *8 (citing *Smith v. Bell Telephone Co. of Pennsylvania*, 397 Pa. 134, 153 A.2d 477, 481 (1959)).  However, "where the facts are so clear that reasonable minds cannot differ" the commencement of the limitations period may be determined as a matter of law.  *Id.*

In legal malpractice actions, the statute of limitations is tolled "only when the client, despite the exercise of due diligence, cannot discover the injury or its cause."  *Ferretti*, 935 A2d at 573.  The standard of reasonable diligence is an objective one.  *Svarzbein v. Saidel*, 1999 U.S. Dist. LEXIS 14516, at *21, (E.D. Pa. Sept. 10, 1999).  Under this standard, "[t]he statute is tolled only if a reasonable person in plaintiff's position would not have been aware of the salient facts" and the "failure to make inquiry when information is available is failure to exercise reasonable diligence as a matter of law."  *Id.* at *22 (citations omitted).

Here, Simons alleges that he first "discovered the malpractice of the Buchanan firm" upon the exercise of his Put Option "in March 2020."  Compl. ¶ 47.  Though Simons asserts multiple theories of recovery, each claim is grounded on Buchanan's alleged violation of its duty "to avoid conflicts of interest" in representing Brown adverse to Simons in connection with the Amendment II, which was signed in December 2015.  *See* Compl. ¶¶ 61, 67, 74.  As is clear

from the face of the Complaint, this cause of action did not accrue in March 2020 but at least four and a half years earlier.

On November 18, 2015, Brown forwarded Simons an email exchange with Buchanan attorney Craig Mills that discussed Brown's proposed changes to the draft of Amendment II, including the language giving rise to this dispute, and further made clear that Buchanan was representing Brown in the transaction. *See* Compl., Ex. 7. Amendment II was also executed by Simons intending to be legally bound on December 3, 2015, which means as of that date, he was in possession of and fully apprised of the language about which he now complains, knowing that Buchanan had represented Brown on Amendment II. *See* Compl., Ex. 7 and 8. Thus, by December 3, 2015, Simons was objectively in possession of all the "salient facts" on which his claims are based. Moreover, the Put-Call Agreement was subsequently amended again in April 2016. Because Amendment III dealt with the same provisions as Amendment II, Simons' attention was again focused, four and a half years before he filed this Complaint, upon the very language he now finds offensive in the Put-Call Agreement. Thus it is wholly unreasonable that Simons first became aware of his potential cause of action in March 2020. *See Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *22. Accordingly, Counts I, II and III should all be dismissed as time barred, having been asserted in Simons' Complaint filed on January 11, 2021, which was more than five years after Simons learned of Buchanan's purported conflict of interest and approved the language he now finds offensive. *See id.*; *Edwards*, 2002 U.S. Dist. LEXIS 16301, at *14.

### III.    The Complaint Should Be Dismissed for Failure to State a Claim

Pennsylvania law recognizes legal malpractice claims under both tort and breach of contract theories. *Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *15. To state a claim under a

negligence theory, the plaintiff bears the burden of proving: (1) employment of the attorney or other basis for a duty; (2) failure of the attorney to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of the harm to the plaintiff. *ASTech Int'l*, 676 F. Supp. 2d at 400 (citing *Gorski v. Smith,* 812 A.2d 683, 693-94 (Pa. Super. Ct. 2002)).   Courts applying Pennsylvania law interpret a claim for breach of fiduciary duty in the legal malpractice context as a claim for breach of the duty of loyalty.  *Nkansah v. Kleinbard LLC*, 2020 U.S. Dist. LEXIS 33094, at *15 (E.D. Pa. Feb. 26, 2020).   "At common law, an attorney owes a fiduciary duty to his client; such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable." *Id.* (citations omitted).

A legal malpractice claim "sounds in negligence unless it is alleged that the [attorney] breached one of the 'specific executory promises which comprise the contract.'" *New York Cent. Mut. Ins. Co. v. Edelstein*, 637 F. App'x 70, 73 (3d Cir. 2016) (citing *Bruno* v. Erie Ins. Co., 106 A.3d 48, 70 (Pa. 2014)).   Recovery under a contract theory "must be assessed under the terms of the contract" and is "governed by general contract law principles." *Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *27 (citing *Fiorentino v. Rapoport*, 693 A.2d 208, 212 (Pa. Super. 1997)).   This includes the privity requirement.  *See id*. at * 31.   To sustain a claim for breach of contract, a plaintiff "may not rely upon evidence that the lawyer merely breached the general, non-contractually created duty of care." *Id.* at * 28 (citing *Tuman v. Genesis Assoc.*, 894 F. Supp. 183 (E.D. Pa. 1995)).   "The gist of such an allegation is negligence, not breach of contract." *Brenco Oil, Inc. v. Blaney*, 2017 U.S. Dist. LEXIS 204775, at *12 (E.D.Pa. Dec. 13, 2017).

## A.  Count III Is Barred by the Gist of the Action Doctrine

A legal malpractice claim sounding in contract requires that the plaintiff establish that the attorney "failed to perform a specific task under the contract."  *Brenco Oil*, 2017 U.S. Dist.

LEXIS 204775, at *8.  Here, the Complaint does not identify any such failure, nor the breach of any "specific executory promises which comprise the contract."  *See Edelstein*, 637 F. App'x at 73.  Rather, in support of his claim for breach of contract, Simons alleges that Buchanan "failed to exercise the ordinary skill and knowledge related to the professional practice of law" and "breach[ed] [its] duty to avoid conflicts of interest by placing Brown's interests far above those of Simons."  Compl. ¶¶ 73, 74.  Accordingly, Count III should be dismissed both under the gist of the action doctrine and for the additional reasons set forth below.

### B.  Simons Fails to Plead the Existence of an Attorney-Client Relationship

While legal malpractice claims sounding in tort and in contract necessarily involve proof of different elements, recovery under either theory requires that the plaintiff plead the existence of a duty arising out of an attorney-client relationship.  *See ASTech Int'l*, 676 F. Supp. 2d at 400; *Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *31.  "Absent an express contract, an implied attorney-client relationship will be found only if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him."  *Cost v. Cost*, 677 A.2d 1250, 1254 (Pa. Super. Ct. 1996).  Here, the Complaint fails to allege that either an express or implied attorney-client relationship ever arose between Simons and Buchanan.  In fact, the only express contract (Buchanan's engagement letter with RDS) proves the exact opposite – that Buchanan did not represent Simons.

The Complaint alleges that in October 2013 "Simons signed a fee agreement ***for the Buchanan Firm to represent RDS*** 'in connection with pursuing vending opportunities with the Philadelphia Airport…[']"  Compl. ¶ 20 (emphasis added).  However, a law firm retained by an

LLC does not enter into a relationship with its members, as well.  Indeed, Pennsylvania Rule of Professional Conduct 1.13(a) provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents."  Rule 1.13(a) thus "makes it clear that an attorney representing a corporation generally represents the corporation and not the corporation's shareholders, officers or directors."  *Robertshaw v. Pudles*, 2014 U.S. Dist. LEXIS 62305, at *3 (E.D.Pa. May 6, 2014).

Simons, as manager of RDS, did retain Buchanan to represent RDS in two commercial matters:  the formation of an affiliated company, Rite-Vend, LLC, and the potential formation of a second affiliate, Regal Vending, LLC.  However, the engagement letter signed by Simons himself, expressly states that Buchanan only represented RDS, ***not*** Simons or any of the individual members of RDS:

> Scope of Representation
>
> The Company is our sole client with respect to this engagement. Individuals or entities that are affiliated with the Company, ***such as its equity owners, members, officers, directors***, parent entities, joint ventures, subsidiaries or other affiliates, ***are not clients of the Firm***, unless we otherwise agree in writing.

Compl., Ex. 3 (emphasis added).  Simons does not allege that he ever signed an engagement letter in which he retained Buchanan to represent him personally, nor that he has ever paid any invoice issued by Buchanan for legal services with his own funds.  Indeed, the invoices attached to the Complaint indicate that the charges were billed to RDS and RDS, not Simons, paid those invoices.  *See* Compl., Exs. 5, 6.

Buchanan has never represented Simons individually in any matter whatsoever.  Simons has not alleged, because he could not do so in good faith, that Buchanan provided him advice and counsel on the Put-Call Agreement or its Amendments (or alleged that Buchanan even communicated with him on these matters).  On the contrary, the documents attached to the

Complaint clearly show that Buchanan represented Brown and was adverse to Simons in the drafting of the original Put-Call Agreement and each of the Amendments thereto, as Simons was objectively aware in 2007, 2011 and in 2015.  *See* Compl., Exs. 1, 2, 7, 8.  Accordingly, the Complaint fails to allege the existence of an attorney-client relationship between Simons and Buchanan.  Nor would it be "reasonable" for Simons to believe that such a relationship existed.  *See Cost*, 677 A.2d at 1254 ("plaintiff's belief that the defendants represented her interests was a *subjective* one, which is insufficient to overcome the grant of preliminary objections.")

Throughout his pleading, Simons repeatedly and improperly attempts to conflate Buchanan's representation of RDS with the firm's putative representation of Simons individually.  Specifically, the Complaint alleges "at all relevant times the Buchanan Firm represented not just RDS, but Simons and all of his business interests as well."  Compl. ¶ 23; *see also id*. at ¶¶ 24-26.  To be sure, given his level of sophistication and business experience as a "serial entrepreneur and pioneer of the vending industry," (*id*. at ¶ 13), it is entirely implausible that Simons believed Buchanan was representing him personally simply because Buchanan attorneys "communicate[d] directly with Simons" regarding "RDS' continuing legal matters" and provided "general corporate advice" for RDS (*id*. at ¶ 30).  This is particularly true given that the invoices attached to the Complaint indicate that the charges for these services were billed to RDS, not to Simons, and the engagement letter expressly provided that Simons was ***not*** the client.  *See* Compl., Exs. 3, 5, 6.  Moreover, since 2019, the parties have been engaged in a dispute over the Put-Call Agreement, both before the AAA and in an action challenging the Arbitration award that is currently pending in the Third Circuit.  At no point over the last two years has Simons ever objected to Buchanan's representation of Brown in this litigation, further

undermining any inference that Simons reasonably believed the firm represented him in connection with the drafting of Amendment II.

The decision in *Cost* is instructive here.  In that case, the plaintiff asserted claims for malpractice against the attorneys who represented her husband and other entities in the sale of a business, alleging that the attorneys had failed to explain the sale to her prior to execution of the closing documents.  *See Cost*, 677 A.2d at 1253-54.  The Superior Court affirmed the trial court's dismissal of the claims, holding that the complaint failed to sufficiently allege that the "defendants owed the plaintiff a duty to represent her interests in the transaction."  *Id*. at 1255.  Similarly, the court in *Svarzbein* dismissed a legal malpractice claim, holding that the defendant attorney "was not privy to any contract with plaintiff."  1999 U.S. Dist. LEXIS 14516 at *31.  The Court should reach the same result here, where the allegations in the Complaint fail to establish an attorney-client relationship between Simons and Buchanan.

### C.  Simons Fails to Plead Breach of Any Duty or Causation of Damages

The Complaint repeatedly alleges that Buchanan violated Pennsylvania Rule of Professional Conduct 1.7 and cites the firm's "conflicts of interest" in representing Brown adverse to Simons in support of the claims in Counts I, II and III.  *See* Compl. ¶¶ 5, 28, 33, 34, 39, 43, 54, 61, 67, 74.  However, even taken as true, the allegation that Buchanan violated Rule 1.7 does not support a cause of action on its own.  To the contrary, as this Court has held:

> "[S]imply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief." *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1284 (Pa. 1992).  The preamble to the Rules themselves cautions that "[v]iolation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached."  Pa. R. Prof'l Conduct, pmbl. ¶ 19.

*Brenco Oil, Inc. v. Blaney*, 2017 U.S. Dist. LEXIS 204775, at \*15 (E.D.Pa. Dec. 13, 2017) (dismissing attorney malpractice claim based on purported violation of Rule 1.7).  It is well established that attorney malpractice claims "bear the traditional elements of a general claim of negligence--duty, breach, causation and damages."  *Cost*, 677 A.2d at 1254.  Here, Simons fails to plead any of these elements.

As explained in Section III.B, *supra*, Buchanan owed no duty to Simons because no attorney-client relationship ever existed.  Nor does Simons plead the required elements of breach or causation of damages.  The Complaint alleges:

> [T]he change of the Valuation Date in the final draft of the Second Amendment effectively reduced the aggregate purchase price of RDS, on the exercise date of March 17, 2020 and for the Put Period ending **December 31, 2019,** to the value of RDS on **December 3, 2015,** preventing Simons from receiving the benefit of over four (4) years of growth of RDS arising from Simons' work, and allowing Brown to obtain all of that benefit by saving him millions of dollars in the purchase of Simons' ownership of RDS, a fraction of what it is really worth.

Compl. ¶ 49.  However, in fixing the Valuation Date for the Put Option as the same date as the start of the Put Period, Amendment II mirrors these same provisions as they appeared in the original Put-Call Agreement from 2007 and as extended by Amendment I in 2011 – both of which were drafted when Simons admits he was being advised by counsel other than Buchanan.  *See* Compl., Exs. 1, 2, 8.

Thus, even assuming the truth of Simons' allegations that an attorney-client relationship existed, which it did not, the Complaint nevertheless fails to identify any action by Buchanan in connection with the Amendment II that caused Simons any harm.  *See Cost*, 677 A.2d at 1255 ("our review of the pleadings fails to indicate how the plaintiff has been damaged by the alleged misconduct of the defendants").  Moreover, the damages sought in a negligence suit may not be speculative.  *See* Pa. R. Civ. P. 1019(f).  Here, Simons alleges only that his misinterpretation of

the Valuation Date is in "dispute," which potentially gives rise to "millions of dollars" in damages involving "additional litigation and exposure." Compl. ¶ 47. This assertion of theoretical financial loss fails to satisfy the damages requirement of a legal malpractice claim. *See Cost*, 677 A.2d at 1255 (holding that plaintiff's reference to "damages she 'may be forced' to pay" because of alleged malpractice was insufficient to support recovery). Accordingly, for these additional reasons, Counts I, II and III should be dismissed in their entirety.

## **CONCLUSION**

For all of the foregoing reasons, Defendant Buchanan Ingersoll & Rooney PC respectfully requests that this Court grant its motion and dismiss the Complaint in its entirety and with prejudice.

Dated:  February 3, 2021                      Respectfully submitted,

*/s/ Craig D. Mills*
Craig D. Mills (PA ID No. 81331)
Andrew G. Hope (PA ID No. 317932)
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 S. 16th Street, Ste 3200
Philadelphia, PA 19102
T:  (215) 665-8700
F:  (215) 665-8760
E:  craig.mills@bipc.com
     andrew.hope@bipc.com

*Attorneys for Buchanan Ingersoll & Rooney PC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served this

3rd day of February, 2021, upon counsel of record via the Court's ECF filing system.


*/s/ Craig D. Mills*
Craig D. Mills