**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

ALAN SIMONS,         :  C.A. NO. 2:21-cv-00129-CMR
              :
      Plaintiff,    :
              :
  v.           :
              :
BUCHANAN INGERSOLL & ROONEY PC, :
and ROYER COOPER COHEN BRAUNFELD :
LLC,            :
      Defendants.  :
_____:

### DEFENDANT BUCHANAN INGERSOLL & ROONEY PC'S
### MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

   Defendant Buchanan Ingersoll & Rooney PC moves the Court pursuant to Federal Rule of

Civil Procedure 12(b)(6) to dismiss the Amended Complaint of Plaintiff Alan Simons in its entirety

and with prejudice. The grounds for this Motion are set forth in the attached supporting

Memorandum of Law.

Dated: March 8, 2021     Respectfully submitted,

             _/s/ Craig D. Mills_
             Craig D. Mills (PA ID No. 81331)
             Andrew G. Hope (PA ID No. 317932)
             BUCHANAN INGERSOLL & ROONEY PC
             Two Liberty Place
             50 S. 16th Street, Ste 3200
             Philadelphia, PA 19102
             Tel: (215) 665-8700
             Fax: (215) 665-8760

             _Attorneys for Buchanan Ingersoll & Rooney PC_

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| _____ : | |
| ALAN SIMONS, : | C.A. NO. 2:21-cv-00129-CMR |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| BUCHANAN INGERSOLL & ROONEY PC, : | |
| and ROYER COOPER COHEN BRAUNFELD : | |
| LLC, : | |
| Defendants. : | |
| _____: | |

**DEFENDANT BUCHANAN INGERSOLL & ROONEY PC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Buchanan Ingersoll & Rooney PC ("Buchanan"), respectfully submits this Memorandum of Law in support of its Motion to Dismiss the Amended Complaint of Plaintiff Alan Simons ("Simons").

## <u>INTRODUCTION</u>

This is a legal malpractice case, brought by Simons against Buchanan even though Buchanan never represented Simons.  In this lawsuit, Simons looks to blame Buchanan for the drop in valuation of his ownership interest in a business caused by COVID.  Not only was Buchanan never Simons' lawyer, but it was Simons who selected the date upon which the business was valued.  There is not a single element of this case that is based upon any meritorious duty, breach or damages, and it is filed beyond the applicable statute of limitations.

## <u>BACKGROUND AND PROCEDURAL HISTORY</u>

The entire focus of Simons' lawsuit is a December 2015 contract amendment, which he argues (not COVID) caused him to receive a lower value for his shares.  First, Buchanan did not

represent Simons with regard to this amendment or otherwise.   Second, the language of the amendment was available and known by Simons in December 2015 and all applicable statutes of limitation have expired.   Third, even if Buchanan had represented Simons (which it did not) and even if the claims were not time barred (which they are), there was nothing inappropriate, unfair or inequitable about the amendment.   The amendment was actually ideal for Simons, and the only reason for his alleged damages (if any) was his poorly timed decision to force a valuation of the business at a time when it was adversely impacted by COVID.

### Buchanan Never Represented Simons

Prior to 2006, Simons owned RDS Vending, LLC ("RDS"), and Buchanan had no relationship with Simons or RDS.   In late 2006, Buchanan's client John Brown ("Brown"), bought a 50% interest in RDS.   Buchanan represented Brown in that acquisition, and Simons was represented by separate counsel.   As part of the acquisition, Brown and Simons signed a "Put-Call Agreement" that gave Simons the right to "put" his remaining 50% interest in RDS to Brown to force Brown to buy him out, and gave Brown the right to "call" Simons' share of RDS to force Simons to sell.   The Put-Call Agreement was subsequently amended three times.   The second of those amendments is at issue in this case.

Buchanan never represented Simons in any matter whatsoever.   On the contrary, Buchanan represented Brown and was adverse to Simons in the drafting of the original Put-Call Agreement and each of the three Amendments thereto.   *See* Am. Compl., Exs. 1, 2, 7, 8.   Simons has never signed an engagement letter in which he retained Buchanan to represent him, never used his own money to pay any Buchanan invoice and never privately consulted, conferred or communicated with any Buchanan attorney about any legal matter separate and apart from Brown.   Thus,

Buchanan has never represented Simons individually in any matter, specifically including the drafting of the Put-Call Agreement and its Amendments.

Simons argues, with no good faith basis, that because Buchanan was engaged to represent RDS on a couple of finite, abbreviated, commercial matters, Buchanan should be "deemed" to have been representing Simons as an individual.  However, these two things are not equivalent.  In fact, when Simons, as manager of RDS, did retain Buchanan to represent RDS in a commercial matter (RDS was pursuing vending routes at the Philadelphia airport), the engagement letter, as signed by Simons himself, expressly states that Buchanan **represented RDS only**, and ***not*** Simons or any of the individual members of RDS.  *See* Am. Compl., Ex. 3 at p. 2.  Of course, Buchanan's engagement by RDS had nothing to do with the Put-Call Agreement, its Amendments or the parties' rights thereunder and all of Buchanan's time was billed to and paid by RDS, not Simons.  No separate or confidential discussions ever occurred between Buchanan and Simons.

Not only was Buchanan never Simons' lawyer, but his actions demonstrate he understands this.  In fact, in an arbitration initiated by Simons against Brown in October 2019 (described below) in which Simons sought to strip Brown of his call rights under the Put-Call Agreement (Simons lost), Buchanan represents Brown adverse to Simons.  In that arbitration, Simons has never once claimed Buchanan represented him or raised an objection to Buchanan's representation of Brown adverse to Simons even though that case has gone through AAA proceedings, Federal District Court and is now at the Third Circuit.  That is not all.

Since early 2019, Buchanan has also represented Brown adverse to Simons in an action currently pending in the Philadelphia Court of Common Pleas in which Brown seeks recovery for Simons' self-dealing, misappropriations and mismanagement of RDS (the "CCP Action").  As in the arbitration adverse to Brown, Simons is represented in the CCP Action by Mr. Bochetto.  In

the CCP Action, Simons waited until 13 months after suit was filed before moving to disqualify Buchanan on the baseless allegation that Buchanan had represented him personally in connection with Buchanan's work for RDS – *not* the Put-Call Agreement or any of its Amendments. Tellingly, when that motion to disqualify came on for a hearing before Judge Wright-Padilla on September 20, 2020, Bochetto ignominiously withdrew the motion, citing a lack of supporting evidence.

### Simons' Expectations for a Bigger Payout Were Based Upon His Misreading of the Put-Call Agreement, COVID and the Poor Timing of His Put Notice – Not Amendment II

The language of the Put-Call Agreement established rather complex and variable periods of time when Simons could exercise his put rights ("Put Period"), and differing periods when Brown could exercise his call rights ("Call Period"). The Put-Call Agreement also set the dates upon which RDS would be valued ("Valuation Date"), which varied based upon circumstances and differed between the put rights and the call rights. There is no question Brown was represented by Buchanan in connection with the Put-Call Agreement in 2006-07, and that Simons was represented by separate counsel.

After the acquisition, Simons continued to serve as president of RDS and run the business, while Brown remained a relatively passive participant, concentrating his attention on other companies that he owns and operates. Buchanan continued to represent Brown in a variety of matters regarding these other businesses. When Buchanan was retained by RDS, the engagement letter, signed by Simons, expressly stated that Buchanan was *not* being engaged by Simons individually. Buchanan has never been engaged to represent Simons and never did.

In the original Put-Call Agreement, Simons' Put Period had a variable start date[1] but a Valuation Date that was *fixed* as the date the Put Period started. The Put-Call Agreement also set the start of Brown's Call Period with a variable start date[2] but a Valuation Date that was *not fixed* as of the date the Call Period started. The Valuation Date for the Call Period was "**the date that the Call Option is exercised**." *See* Am. Compl., Ex. 1 at paragraphs 2 and 3. Simons, represented by counsel other than Buchanan, accepted these terms.

This distinction in the original Put-Call Agreement between the *fixed* Valuation Date for Simons' Put Option versus the *flexible* Valuation Date for Brown's Call Option (negotiated at a time when Simons admits he was not represented by Buchanan) is critical. From the very beginning, the Valuation Date of Simons' put was not pinned to the date he elected to exercise it (unlike Brown's Valuation Date for his call). In the original Put-Call Agreement, Simons' Put Period was from year three to year five. However, if Simons continued to work at RDS beyond the third anniversary of that Agreement (1/2/10), the Valuation Date remained the start of the Put Period or the third anniversary (1/2/10). Therefore, from the very beginning, Simons agreed that he would not benefit from any value increase in RDS between years three and five even if he remained President during that time.

The Put-Call Agreement was modified on three occasions - Amendment I on June 30, 2011, Amendment II on December 3, 2015 and Amendment III on April 12, 2016.[3] Each of these Amendments was necessitated by the parties' desire to extend the original Put and Call Periods in the Put-Call Agreement because Simons continued to extend his employment with RDS beyond

---

[1] The start date for the Put Period was the earliest of four different events.
[2] The start date for the Call Period was also the earliest of four events, but not the same four events as applicable to the Put Period.
[3] The substance of the change in Amendment III is not relevant to this dispute.

the original period set in the Put-Call Agreement.  The language in each Amendment tracked the original structure, and the original disparity between the inflexibility of the Valuation Date for the Put Option and the flexibility of the Valuation Date for the Call Option was preserved and accepted by the parties.

For Amendment I in 2011, Buchanan represented Brown and Simons admits he was represented by separate counsel. At that time, Buchanan had not yet even been engaged to represent RDS in any matter.  Amendment I was signed on June 30, 2011 which was six months *after* the start of the new Put Period (which started on January 1, 2011) so the Valuation Date for the Put Option was fixed - **at the time Amendment I was signed** - as of January 1, 2011.  *See* Am. Compl., Ex. 2.  That is, Simons, while represented by counsel other than Buchanan, agreed to a fixed Valuation Date that was based on a date six months in the past and therefore agreed that he would not share in any increase in future value of RDS (nor risk suffering from any future loss in value).  In Amendment I, Simons agreed to the concept of setting a fixed Valuation Date that would lock in the value of his shares, avoiding any future risk (or reward).[4]

Between Amendment I (June 30, 2011) and Amendment II (December 3, 2015), Simons continued to run RDS, Buchanan continued to represent Brown, and Buchanan was engaged to represent RDS by an engagement letter that expressly said Buchanan was not representing Simons.

For Amendment II, Buchanan represented Brown and not Simons, just like Buchanan had in the original Put-Call Agreement and Amendment I.  Buchanan's communications regarding Amendment II were exclusively with Brown.  Buchanan had no communication with Simons regarding Amendment II.  Rather, Simons consulted and communicated solely with lawyers at

---

[4]The Valuation Date for the Call Option remained flexible as "the date the Call Option is exercised."  *See* Am. Compl., Ex. 2 at amended paragraphs 2 and 3.

Royer Cooper Cohen Braunfeld LLC, the other defendant in this action, with regard to Amendment II. Simons was plainly aware that Buchanan was representing Brown and not him on Amendment II, as is obvious from the November 2015 emails attached to the Amended Complaint showing that Buchanan attorneys were advising Brown, and not Simons, regarding Amendment II. *See* Am. Compl., Ex. 7.

Amendment II (dated December 3, 2015), like Amendment I, tracked the language of the original Put-Call Agreement. *See* Am. Compl., Exs. 1, 2, 8. Though Amendment II extended the Put and Call Periods, Amendment II preserved the inflexible v. flexible Valuation Date distinction between Simons' put rights and Brown's call rights. For Simons' Put Option, the Valuation Date remained fixed at the start of the Put Period, which was December 3, 2015.[5] Just like in Amendment I, Simons agreed in Amendment II to the concept of setting a fixed Valuation Date that would lock in the value of his shares and avoid any future risk. However, unlike Amendment I, in Amendment II, in addition to setting a "floor" for Simons' valuation (as of December 3, 2015 – the best year RDS had ever had to that point), Simons negotiated the ability to reap the benefit of future increases in value. For Simons, Amendment II was truly a "win-win."

Amendment II provided Brown a 12-month period from when Simons put his shares to Brown to allow Brown to obtain financing in order to acquire Simons' interest in RDS. That is, Amendment II gave Brown up to one year to close on Simons' Put Notice ("Brown's Close Date"). And, Amendment II provided Simons with the benefit of receiving the higher valuation for his shares between the fixed Valuation Date of December 3, 2015 (*i.e.*, the "floor") and Brown's Close Date. This provided Simons with the benefit of having a "floor" value for his shares based upon

---

[5] The Valuation Date for the Call Option remained flexible to "the date the Call Option is exercised." *See* Am. Compl., Ex. 8 at amended paragraphs 2 and 3.

2015 numbers (a great year) but also the potential to gain any upside in value increase that occurred as of Brown's Close Date – truly a "win-win."

Simons' entire claim against Buchanan is premised on his false assertion that Buchanan represented him and a complete misreading of Amendment II.  Simons incorrectly alleges that Amendment II adversely impacted him because "even if Simons spent the next five (5) years of his life growing the business, he would see not one dime for that growth." Am. Compl. ¶ 47.  This is exactly the opposite of what Amendment II says.  In fact, Amendment II expressly provided Simons with the higher valuation between a Valuation Date of (a) December 3, 2015 and (b) Brown's Close Date.  Had RDS's value grown between the signing of Amendment II and Brown's Close Date, Simons would have reaped the benefit of that increase.

Amendment III was signed in April 2016, just months after Amendment II.  Though the substance of this change is not relevant here, it is relevant that, like the Put-Call Agreement and Amendments I and II, Buchanan did not represent nor have any communications with Simons with regard to Amendment III.  Buchanan's only communications regarding Amendment III were with Brown.  It is also relevant that Amendment III involved the same paragraphs at issue here (paragraphs 2 and 3 to the Put-Call Agreement), which again highlighted for Simons the language he now finds offensive as far back as April 2016.

**Simons Delays and then Mis-Times His Put to Brown**

For years after signing Amendment II, Simons elected not to put his shares to Brown as the value of RDS grew.  Instead, Simons elected to hold his 50% share in RDS and his position as its sole Manager and to earn millions in dividends and salary.  In late 2018, Brown discovered that Simons had also been incentivized not to sell out his interest because Simons had been abusing his powers as Manager to enrich himself and his family.  In March of 2019, after Brown complained

of Simons' mismanagement and demanded an independent audit of RDS's finances, Simons filed a surprise arbitration demand against Brown (the "Arbitration").   In the Arbitration, Simons unsuccessfully sought to avoid further scrutiny of his mismanagement by seeking to void Brown's call rights under the Put-Call Agreement.  These sham claims were dismissed by AAA Arbitrator Judy Weintraub in October 2019, and Simons' petition to overturn the Arbitration award in Brown's favor was denied by Judge Gerald McHugh of the United States District Court for the Eastern District of Pennsylvania, who confirmed the award in March 2020.  Simons' meritless appeal of Judge McHugh's decision is currently pending in the United States Court of Appeals for the Third Circuit.

Had Simons elected to put his shares to Brown in March of 2019 instead of filing the frivolous Arbitration against Brown, Simons could have cashed out at a time when RDS was at its highest valuation and reaped the millions he now claims he lost due to the COVID-induced downturn.  Instead, and certainly not anticipating something like COVID to ever happen, Simons held his shares with the expectation that RDS's value would to continue to rise.  But, the world changed between March 2019 and March 2020.

By March 2020, Simons' Arbitration against Brown had been dismissed and affirmed in Federal Court, Brown was pressing for an audit of Simons' malfeasance in running RDS and the world was starting its COVID-induced lockdown which Simons knew would adversely impact RDS's sales and value.  It was at this point that Simons abruptly changed course and put his shares to Brown on March 17, 2020 (the "Put Notice").  The Put Notice was delivered to Buchanan, as counsel for Brown, by Simons' counsel George Bochetto, Esq., who also represents Simons in the Arbitration (but not, interestingly, in this malpractice action).  *See* Am. Compl. ¶¶ 54-55.  The

effect of the Put Notice is to require Brown to buy Simons' 50% share in RDS no later than one year after the notice (March 17, 2021).  The Put Notice is irrevocable.

Simons' about-face decision to issue the Put Notice on March 17, 2020 was designed to be a bold, strategic ploy to force Brown to buy out Simons' 50% interest based on RDS's revenues for 2019, which Simons rightly anticipated would be much higher than the COVID-impacted 2020 revenues.[6]  However, the strategy backfired because it was premised entirely upon Simons' (and Bochetto's) misreading of the Valuation Date terms that had not changed in substance since 2007.  *See* Am. Compl., Exs. 1, 2, 8.

In delivering his Put Notice in March 2020, Simons forgot or perhaps never understood that since 2007, the Valuation Date for the Put Option was very different than the Valuation Date for the Call Option.  The Valuation Date for the Put Option was fixed as of the start of the Put Period which, per Amendment II, was December 3, 2015.  Simons mistakenly thought he had the ability to manipulate the Valuation Date in sync with his Put Notice date.  But, per the terms of Amendment I of the Put-Call Agreement, he had not had that ability since January 1, 2010.

Also, because of Amendment II, Brown was not forced to close immediately on Simons' shares; Brown had 12 months to prepare for Brown's Close Date.  After failed negotiations to agree on a valuation date, Brown informed Simons that Brown's Close Date would occur in September 2020.  Per Amendment II, the value for Simons' shares would therefore be the higher of RDS's value as of December 3, 2015 or September 7, 2020 – not the value as of the date of Simon's Put Notice (March 17, 2020) that Simons had mistakenly targeted.  *See* Am. Compl., Ex. 8 at amended paragraph 2.

---

[6] Per the agreement, the value was based upon the 12-month period ending on the last day of the calendar quarter before the Valuation Date.

Simons' incorrect assumption that he could peg the Valuation Date for the Put Option as the same date as his Put Notice led him to expect that he would realize a higher valuation for his ownership interest.  However, per the Put-Call Agreement, the Valuation Date was fixed as the higher value for RDS between a Valuation Date of December 3, 2015 or September 7, 2020. Despite the timing of the Put Notice, Simons' Valuation Date for his 50% interest is not calculated based on RDS's 2019 revenues.

After delivering his gaffe-induced Put Notice, Simons retained the law firm of Cozen O'Connor to represent him in finalizing the Put Purchase Price and drafting the release under which Brown would purchase his shares.  Brown, again represented by Buchanan with no objection from Simons, apprised Simons' counsel that the Valuation Date he had targeted was incorrect and proposed a Put Purchase Price calculated based upon the (correct) date.  *See* Am. Compl. ¶ 55.  Outraged to find that he and his counsel had employed an errant strategy in putting his shares to Brown, Simons retained yet another lawyer, Paul Rosen, Esq., to file this action, claiming for the first time that Buchanan's representation of Brown in connection with Amendment II represented a conflict of interest.  Essentially, stinging from shooting himself in his own foot – or being shot by his then-counsel – Simons now struggles to find someone else to blame.

In bringing this legal malpractice action, Simons improperly seeks recovery from a law firm that never represented him on time-barred claims for which he has failed to plead any breach or causation of damages.  Simons' claims against Buchanan for negligent misrepresentation and tortious interference with the Put-Call Agreement by virtue of its representation of Brown in connection with Amendment II is similarly time barred.  Moreover, Simons cannot state a claim

against Buchanan as an agent for a party to the Put-Call Agreement.  And Buchanan is immune from liability, having advised its client in good faith during the negotiation of Amendment II.

## ARGUMENT

### I.       Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Although the Court must accept all well-pleaded facts as true and draw reasonable inferences in favor of the plaintiff, it need not accept legal conclusions masquerading as facts.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 555).  In addition, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Iqbal*, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).  To state a plausible claim, a plaintiff must "provide the 'grounds' of his 'entitle[ment] to relief' [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).

### II.      The Amended Complaint Should Be Dismissed as Time Barred

While the essence of Simons' claim is legal malpractice, he asserts multiple theories of recovery: breach of fiduciary duty (Count I), professional negligence (Count II), breach of contract (Count III), negligent misrepresentation (Count IV) and tortious interference with contractual relations (Count V).  Under Pennsylvania law, the statute of limitations for breach of fiduciary duty and professional negligence is two years. *Edwards v. Duane, Morris & Heckscher, LLP*, 2002 U.S. Dist. LEXIS 16301, at *14 (E.D. Pa. Aug. 7, 2002); *ASTech Int'l, LLC v. Husick*, 676

F. Supp. 2d 389, 396-97 (E.D. Pa. 2009).   The limitations period for claims of negligent misrepresentation and tortious interference with contractual relations is also two years. *Doddapaneni v. Exide Corp.*, 2000 U.S. Dist. LEXIS 15, at *4 (E.D. Pa. Jan. 5, 2000); *Hyldahl v. Denlinger*, 661 Fed. Appx. 167, 170 (3d Cir. 2016).   The statute of limitations for breach of contract actions is four years.   *Edwards*, 2002 U.S. Dist. LEXIS 16301, at *16.

Pennsylvania favors strict application of the statutes of limitation.   *Wachovia Bank, N.A. v. Ferretti*, 935 A2d 565, 572 (Pa. Super. Ct. 2007).   "[T]he trigger for the accrual of a legal malpractice action is not the realization of actual loss, but the occurrence of a breach of duty." *Ross v. Meyer*, 2014 U.S. Dist. LEXIS 83349, at *35 (E.D. Pa. June 19, 2014).   When the issue of whether the statute of limitations has run involves a factual determination, the determination is for the jury.   *Edwards*, 2002 U.S. Dist. LEXIS 16301, at *8 (citing *Smith v. Bell Tel. Co. of Pennsylvania*, 397 Pa. 134, 153 A.2d 477, 481 (1959)).   However, "where the facts are so clear that reasonable minds cannot differ" the commencement of the limitations period may be determined as a matter of law.   *Id*.

In legal malpractice actions, the statute of limitations is tolled "only when the client, despite the exercise of due diligence, cannot discover the injury or its cause." *Ferretti*, 935 A2d at 573.   The standard of reasonable diligence is an objective one.   *Svarzbein v. Saidel*, 1999 U.S. Dist. LEXIS 14516, at *21, (E.D. Pa. Sept. 10, 1999).   Under this standard, "[t]he statute is tolled only if a reasonable person in plaintiff's position would not have been aware of the salient facts" and the "failure to make inquiry when information is available is failure to exercise reasonable diligence as a matter of law." *Id.* at *22 (citations omitted).

Here, Simons alleges that he first "discovered the malpractice of the Buchanan firm" upon the exercise of his Put Option "in March 2020."   Am. Compl. ¶ 54.   Though Simons asserts

multiple theories of recovery, each claim is grounded on Buchanan's alleged violation of its duty to "avoid" and "disclose" purported "conflicts of interest" in representing Brown adverse to Simons in connection with the Amendment II, which was signed in December 2015. *See* Am. Compl. ¶¶ 72, 78, 85, 91, 98. As is clear from the face of the Amended Complaint, this cause of action did not accrue in March 2020 but at least four and a half years earlier.

On November 18, 2015, Brown forwarded Simons an email exchange with Buchanan attorney Craig Mills that discussed Brown's proposed changes to the draft of Amendment II, including the language giving rise to this dispute, and further made clear that Buchanan was representing Brown in the transaction. *See* Am. Compl., Ex. 7. Amendment II was also executed by Simons intending to be legally bound on December 3, 2015, which means as of that date, he was in possession of and fully apprised of the language about which he now complains, knowing that Buchanan had represented Brown on Amendment II. *See id*., Exs. 7, 8. Thus, by December 3, 2015, Simons was objectively in possession of all the "salient facts" on which his claims are based.

Moreover, the Put-Call Agreement was subsequently amended again in April 2016. Because Amendment III dealt with the same provisions as Amendment II, Simons' attention was again focused, four and a half years before he initiated this action, upon the very language he now finds offensive in the Put-Call Agreement. Thus it is wholly unreasonable that Simons first became aware of his potential cause of action in March 2020. *See Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *22. Accordingly, Counts I, II, III, IV and V should all be dismissed as time barred, having been asserted more than five years after Simons learned of Buchanan's purported conflict of interest and approved the language he now finds offensive. *See id.*; *Edwards*, 2002 U.S. Dist. LEXIS 16301, at *14.

14

### III.      The Amended Complaint Should Be Dismissed for Failure to State a Claim

Pennsylvania law recognizes legal malpractice claims under both tort and breach of contract theories. *Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *15.  To state a claim under a negligence theory, the plaintiff bears the burden of proving: (1) employment of the attorney or other basis for a duty; (2) failure of the attorney to exercise ordinary skill and knowledge; and (3) that such failure was the proximate cause of the harm to the plaintiff. *ASTech Int'l*, 676 F. Supp. 2d at 400 (citing *Gorski v. Smith,* 812 A.2d 683, 693-94 (Pa. Super. Ct. 2002)).  Courts applying Pennsylvania law interpret a claim for breach of fiduciary duty in the legal malpractice context as a claim for breach of the duty of loyalty. *Nkansah v. Kleinbard LLC*, 2020 U.S. Dist. LEXIS 33094, at *15 (E.D. Pa. Feb. 26, 2020).  "At common law, an attorney owes a fiduciary duty to his client; such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable." *Id.*  (citations omitted).

A legal malpractice claim "sounds in negligence unless it is alleged that the [attorney] breached one of the 'specific executory promises which comprise the contract.'" *New York Cent. Mut. Ins. Co. v. Edelstein*, 637 F. App'x 70, 73 (3d Cir. 2016) (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 70 (Pa. 2014)).  Recovery under a contract theory "must be assessed under the terms of the contract" and is "governed by general contract law principles." *Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at *27 (citing *Fiorentino v. Rapoport*, 693 A.2d 208, 212 (Pa. Super. 1997)).  This includes the privity requirement. *See id*. at *31.  To sustain a claim for breach of contract, a plaintiff "may not rely upon evidence that the lawyer merely breached the general, non-contractually created duty of care." *Id.* at *28 (citing *Tuman v. Genesis Assoc.*, 894 F. Supp. 183 (E.D. Pa. 1995)).  "The gist of such an allegation is negligence, not breach of contract." *Brenco Oil, Inc. v. Blaney*, 2017 U.S. Dist. LEXIS 204775, at *12 (E.D. Pa. Dec. 13, 2017).

### A.  Count III Is Barred by the Gist of the Action Doctrine

A legal malpractice claim sounding in contract requires that the plaintiff establish that the attorney "failed to perform a specific task under the contract." *Brenco Oil*, 2017 U.S. Dist. LEXIS 204775, at \*8.  Here, the Amended Complaint does not identify any such failure, nor the breach of any "specific executory promises which comprise the contract."  *See Edelstein*, 637 F. App'x at 73.  Rather, in support of his claim for breach of contract, Simons alleges that Buchanan "failed to exercise the ordinary skill and knowledge related to the professional practice of law" and "breach[ed] [its] duty to avoid conflicts of interest by placing Brown's interests far above those of Simons."  Am. Compl. ¶¶ 86, 87.  Thus, Simons' "malpractice claim arises from [Buchanan's alleged] negligent performance of its contractual obligations and, therefore, sounds in tort."  *See Edelstein*, 637 F. App'x at 73.  Accordingly, Count III should be dismissed both under the gist of the action doctrine and for the additional reasons set forth below.

### B.  Counts I, II, III and IV Should Be Dismissed for Failure to Plead the Existence of an Attorney-Client Relationship

While legal malpractice claims sounding in tort and in contract necessarily involve proof of different elements, recovery under either theory requires that the plaintiff plead the existence of a duty arising out of an attorney-client relationship.  *See ASTech Int'l*, 676 F. Supp. 2d at 400; *Svarzbein*, 1999 U.S. Dist. LEXIS 14516, at \*31.  The same is true of Simons' claim for negligent misrepresentation.  *See Villari Brandes & Giannone, PC v. Wells Fargo Fin. Leasing, Inc.*, 2013 U.S. Dist. LEXIS 141391, at \*23-24 (E.D. Pa. Sept. 30, 2013); *see also Smith v. Griffiths,* 327 Pa. Super. 418, 425, 476 A.2d 22, 26 (Pa. Super. Ct. 1984) ("The general rule is that an attorney will be held liable for negligence only to his client.").

"Absent an express contract, an implied attorney-client relationship will be found only if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was

within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him." *Cost v. Cost*, 677 A.2d 1250, 1254 (Pa. Super. Ct. 1996).  Here, the Amended Complaint fails to allege that either an express or implied attorney-client relationship ever arose between Simons and Buchanan.  In fact, the only express contract (Buchanan's engagement letter with RDS) proves the exact opposite – that Buchanan did not represent Simons.

The Amended Complaint alleges that in October 2013 "Simons signed a fee agreement ***for the Buchanan Firm to represent RDS*** 'in connection with pursuing vending opportunities with the Philadelphia Airport…[']"  Am. Compl. ¶ 20 (emphasis added).  However, a law firm retained by an LLC does not enter into a relationship with its members, as well.  Indeed, Pennsylvania Rule of Professional Conduct 1.13(a) provides that "[a] lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents."  Rule 1.13(a) thus "makes it clear that an attorney representing a corporation generally represents the corporation and not the corporation's shareholders, officers or directors."  *Robertshaw v. Pudles*, 2014 U.S. Dist. LEXIS 62305, at *3 (E.D. Pa. May 6, 2014).

The engagement letter signed by Simons himself expressly states that Buchanan only represented RDS, ***not*** Simons or any of the individual members of RDS:

> Scope of Representation
>
> The Company is our sole client with respect to this engagement. Individuals or entities that are affiliated with the Company, ***such as its equity owners, members, officers, directors***, parent entities, joint ventures, subsidiaries or other affiliates, ***are not clients of the Firm***, unless we otherwise agree in writing.

Am. Compl., Ex. 3 at p. 2 (emphasis added).  Simons does not allege that he ever signed an engagement letter in which he retained Buchanan to represent him personally, nor that he has ever paid any invoice issued by Buchanan for legal services with his own funds, nor that he ever had

any communications with Buchanan regarding the Put-Call Agreement and/or Amendment II thereto.  Indeed, the invoices attached to the Amended Complaint indicate that the charges were billed to RDS, and RDS, not Simons, paid those invoices.  *See* Am. Compl., Exs. 5, 6.

Buchanan has never represented Simons individually in any matter whatsoever.  Simons has not alleged, because he could not do so in good faith, that Buchanan provided him advice and counsel on the Put-Call Agreement or its Amendments (or alleged that Buchanan even communicated with him on these matters).  On the contrary, the documents attached to the Amended Complaint clearly show that Buchanan represented Brown and was adverse to Simons in the drafting of the original Put-Call Agreement and each of the Amendments thereto, as Simons was objectively aware in 2007, 2011 and in 2015.  *See* Am. Compl., Exs. 1, 2, 7, 8.  Accordingly, the Amended Complaint fails to allege the existence of an attorney-client relationship between Simons and Buchanan.  Nor would it be "reasonable" for Simons to believe that such a relationship existed.  *See Cost*, 677 A.2d at 1254 ("plaintiff's belief that the defendants represented her interests was a *subjective* one, which is insufficient to overcome the grant of preliminary objections.")

Throughout his pleading, Simons repeatedly and improperly attempts to conflate Buchanan's representation of RDS with the firm's putative representation of Simons individually.  Specifically, the Amended Complaint alleges "at all relevant times the Buchanan Firm represented not just RDS, but Simons and all of his business interests as well."  Am. Compl. ¶ 24; *see also id*. at ¶¶ 26-28.[7]   However, the October 11, 2013 engagement letter attached to the Amended

---

[7] Oddly, Simons further alleges the existence of a conflict because "RDS was in fact the successor to the ownership that was delineated in the terms of the Put and Call Agreement, and was the sole beneficiary of the outcome of the enforcement of the breach of the terms of the agreement which is at the center of this case."  Am. Compl. ¶ 25.  It is not immediately apparent how RDS, the entity, could be the successor to its ownership.  Indeed, the ownership of RDS delineated in the Put-Call Agreement was John Brown and Alan Simons, with Brown having the right or duty to

Complaint expressly states that Buchanan did ***not*** represent Simons personally.  *See id*., Ex. 3 at p. 2.

To be sure, given his level of sophistication and business experience as a "serial entrepreneur and pioneer of the vending industry" (Am. Compl. ¶ 13), it is entirely implausible that Simons believed Buchanan was representing him personally simply because Buchanan attorneys "communicate[d] directly with Simons" regarding "RDS' continuing legal matters" and provided "general corporate advice" for RDS (*id*. at ¶ 36).  This is particularly true given that the invoices attached to the Amended Complaint indicate that the charges for these services were billed to RDS, not to Simons, and the engagement letter expressly provided that Simons was ***not*** the client.  *See id*., Exs. 3, 5, 6.  Moreover, since 2019, the parties have been engaged in a dispute over the Put-Call Agreement, both before the AAA and in an action challenging the Arbitration award that is currently pending in the Third Circuit.  At no point over the last two years has Simons ever objected to Buchanan's representation of Brown in this litigation, further undermining any inference that Simons reasonably believed the firm represented him in connection with the drafting of Amendment II.

The decision in *Cost* is instructive here.  In that case, the plaintiff asserted claims for malpractice against the attorneys who represented her husband and other entities in the sale of a business, alleging that the attorneys had failed to explain the sale to her prior to execution of the closing documents.  *See Cost*, 677 A.2d at 1253-54.  The Superior Court affirmed the trial court's dismissal of the claims, holding that the complaint failed to sufficiently allege that the "defendants owed the plaintiff a duty to represent her interests in the transaction."  *Id*. at 1255.  Similarly, the

---

buy Simons out.  Both Brown and Simons were beneficiaries of the Put-Call Agreement and of any enforcement of its terms.  Additionally, RDS is not a party here.

court in *Svarzbein* dismissed a legal malpractice claim, holding that the defendant attorney "was not privy to any contract with plaintiff." 1999 U.S. Dist. LEXIS 14516 at *31. The Court should reach the same result here, where the allegations in the Amended Complaint fail to establish an attorney-client relationship between Simons and Buchanan. *See also Villari*, 2013 U.S. Dist. LEXIS 141391, at *24 ("Because VBG has not plausibly alleged that either Wells Fargo or [its attorney] owed it a duty of care…, VBG's negligence claim [ ] must also be dismissed."). Accordingly, Counts I through IV of the Amended Complaint should be dismissed.

### C.  Simons Fails to Plead Breach of Any Duty or Causation of Damages

The Amended Complaint repeatedly alleges that Buchanan violated Pennsylvania Rule of Professional Conduct 1.7 and cites the firm's "conflicts of interest" in representing Brown adverse to Simons in support of each of the five Counts in the Amended Complaint. *See* Am. Compl. ¶¶ 5, 31, 39, 40, 45, 50, 62, 72, 74, 79, 82, 85, 88, 91, 98. However, even taken as true, the allegation that Buchanan violated Rule 1.7 does not support a cause of action on its own. To the contrary, as this Court has held:

> "[S]imply because a lawyer's conduct may violate the rules of ethics does not mean that the conduct is actionable, in damages or for injunctive relief." *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1284 (Pa. 1992). The preamble to the Rules themselves cautions that "[v]iolation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached." Pa. R. Prof'l Conduct, pmbl. ¶ 19.

*Brenco Oil*, 2017 U.S. Dist. LEXIS 204775, at *15 (dismissing attorney malpractice claim based on purported violation of Rule 1.7). It is well established that attorney malpractice claims "bear the traditional elements of a general claim of negligence--duty, breach, causation and damages." *Cost*, 677 A.2d at 1254. Tortious interference with contractual relations similarly requires the

"occasioning of actual legal damage as a result of the defendant's conduct." *Pelagatti v. Cohen*,

536 A.2d 1337, 1343 (Pa. Super. Ct. 1987).  Here, Simons fails to plead any of these elements.

As explained in Section III.B, *supra*, Buchanan owed no duty to Simons because no

attorney-client relationship ever existed.  Nor does Simons plead the required elements of breach

or causation of damages.  The Amended Complaint reveals that Simons' claims against Buchanan

are premised upon his complete misunderstanding of Amendment II:

> [T]he change of the Valuation Date in the final draft of the Second
> Amendment effectively reduced the aggregate purchase price of RDS, on
> the exercise date of March 17, 2020 and for the Put Period ending ***December
> 31, 2019,*** to the value of RDS on ***December 3, 2015,*** preventing Simons
> from receiving the benefit of over four (4) years of growth of RDS arising
> from Simons' work, and allowing Brown to obtain all of that benefit by
> saving him millions of dollars in the purchase of Simons' ownership of
> RDS, a fraction of what it is really worth.

Am. Compl. ¶ 56.  Simons' proffered interpretation is simply inconsistent with the express

language of Amendment II.  The reason Simons did not receive a higher valuation for his shares

is because he elected not to exercise his Put Option in 2016, 2017, 2018 or 2019 as RDS grew in

value.  Instead, he held onto his shares expecting them to increase in value and not expecting

COVID to come along.  The only reason Simons did not receive the highest possible value for his

shares is that he waited to put his shares to Brown until a time when COVID adversely impacted

the valuation.

Amendment II expressly provides that Simons was to receive the higher valuation of RDS

as calculated either on December 3, 2015 (the start of the Put Period) or on Brown's Closing Date.

Ex. 8 at amended paragraph 2.[8]  Thus, under the language of Amendment II, Simons was not to be

---

[8]  Paragraph 2 of Amendment II provides "The Put Purchase Price shall be the greater of (A) the
price that would be paid to Simons calculated based upon the Valuation Date (as defined above)
and (B) the price that would be paid to Simons if the Valuation Date was the last day of the

denied the fruits of his labors were RDS to increase in value between December 3, 2015 and Brown's Close Date.  Amendment II also included a number of additional protections for Simons, including the requirement that "Simons (or his estate, as the case may be) shall continue to be paid his then base salary until the Option Interests are paid in full."  *Id.*

Finally, and perhaps most crucially, in fixing the Valuation Date for the Put Option as the same date as the start of the Put Period, paragraph 2 of Amendment II mirrors the provision as it appeared in the original 2007 Put-Call Agreement and as extended by Amendment I in 2011 – both of which were drafted when Simons admits he was being advised by counsel other than Buchanan.  *See* Am. Compl., Exs. 1, 2, 8.  Indeed, given this continuity of the language pertaining to the Valuation Date, the allegation that Buchanan "concealed" this non-existent "change in the valuation of the purchase price in favor of Brown," which Plaintiff contends forms the "heart of [his] claims of malpractice and intentional conduct" is absurd on its face.  *See id.* ¶ 46.  So too is Simons' claim that Buchanan "had a duty to exercise reasonable care to disclose to Simons its full perceived understanding of the Second Amendment, that the 'Valuation Date' for the Put Option would be the ***date the Second Amendment is signed***" (*id.* ¶ 91), since that provision remained unchanged from either the original Put-Call Agreement or Amendment I.  *See* Am. Compl., Exs. 1, 2, 8.  Thus, even assuming the truth of Simons' allegations that an attorney-client relationship existed, which it did not, the Amendment Complaint nevertheless fails to identify any action by Buchanan in connection with Amendment II that caused Simons any harm.  *See Cost*, 677 A.2d at 1255 ("our review of the pleadings fails to indicate how the plaintiff has been damaged by the alleged misconduct of the defendants").

---

calendar month that ended immediately prior to the date on which Buyer pays for the Option Interests in Full."

The Amended Complaint is further beset by its failure to adequately plead any compensable damages. "[I]n a legal malpractice action, it is not sufficient for a plaintiff to prove future or speculative damages; rather, a plaintiff must prove actual damages arising from an attorney's breach of duty." *Cook v. Gelman*, 2018 Pa. Super. Unpub. LEXIS 537, at *9, (Pa. Super. Ct. Feb. 21, 2018). Here, Simons alleges only that his misinterpretation of the Valuation Date is in "dispute," which potentially gives rise to "millions of dollars" in damages involving "additional litigation and exposure," the "filing" and "expense" of arbitration, and the potential that such arbitration finds that the purchase price of his interest in RDS has been "reduced and eviscerated." Am. Compl. ¶¶ 54, 65. This assertion of theoretical financial loss fails to satisfy the damages requirement of a legal malpractice claim. *See Cost*, 677 A.2d at 1255 (holding that plaintiff's reference to "damages she 'may be forced' to pay" because of alleged malpractice was insufficient to support recovery). Nor does it articulate damages sufficient to support of a claim for tortious interference with contractual relations. *See Pelagatti*, 536 A.2d at 1343 (holding that "claim of pecuniary loss" arising from defendant's alleged tortious interference was "premature as a matter of law" prior to "verdict through final judgment" in separate litigation). Moreover, Simons' claims for litigation costs are not compensable at all under the American Rule. *See Bd. of Trs. v. Liberty Mut. Ins. Co.*, 2015 U.S. Dist. LEXIS 91723, at *10 (E.D. Pa. July 14, 2015) ("The general rule of law, known as the 'American Rule' is that each party to a lawsuit bears its own attorneys' fees."). Accordingly, for these additional reasons, the Amended Complaint should be dismissed in its entirety.

### D. Count V Should Be Dismissed for Failure to Plead the Elements of Tortious Interference with Contractual Relations

To set forth a viable cause of action for tortious interference with contract under Pennsylvania law, plaintiffs must plead the following elements: (1) the existence of a contractual,

or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. *Pelagatti*, 536 A.2d at 1343.  As explained in Section III(C), *supra*, Simons fails to plead the second and fourth elements of a tortious interference claim.  Nor does the Amended Complaint satisfy the first or third elements of such a claim.

In Count V, Simons alleges that "there were existing contracts between Simons and a third party, Brown" — namely, "the Put and Call Agreement and the MIPA" — and that Buchanan "took purposeful, intentional and wrongful action specifically intended to harm that existing relation, to the detriment of Simons."  Am. Compl. ¶¶ 96, 97.  However, because Simons seeks recovery against Buchanan in its capacity as an agent of Brown in connection with the Put-Call Agreement and MIPA, to which Brown is a party, Simons' claim for tortious interference necessarily must fail. *See A.D.E. Food Servs. Corp. v. City of Philadelphia*, 1996 U.S. Dist. LEXIS 15159, at *30 (E.D. Pa. Oct. 11, 1996) ("In Pennsylvania, one cannot be liable for tortious interference with a contract to which one is a party." (citation omitted)); *Surya Sys. v. Sunku*, 2005 U.S. Dist. LEXIS 12544, at *10 (E.D. Pa. June 24, 2005) ("Defendants rightly assert that a tortious interference claim against Sunku cannot lie, because Sunku was a party to the contract in question and therefore cannot have been a third-party interloper.").

Moreover, in order to make out a claim for tortious interference with contractual relations, a plaintiff must not only prove the defendant's "purposeful action" but also that such action was taken without "privilege or justification." *Pelagatti*, 536 A.2d at 1343.  In Count V, Simons contends "the Buchanan Firm had no privilege or justification for its conduct" in representing

Brown in connection with Amendment II.  Am. Compl. ¶ 98.  However, "[w]here an attorney represents a client in litigation or during arms['] length negotiations, the public interest demands that attorneys, in the proper exercise of their functions as such, not be liable to adverse parties for acts performed in good faith and for the honest purpose of protecting the interests of their clients." *Smith*, 476 A.2d at 26 (affirming defendant attorney's preliminary objections).  *See also Brown v. Delaware Valley Transplant Program*, 372 Pa. Super. 629, 539 A.2d 1372, 1375 (Pa. Super. Ct. 1988) (affirming dismissal of claims in light of defendant attorney's immunity from suits based on conduct undertaken in connection with representation of client in judicial proceeding).

Attorneys have a duty to zealously represent their clients.  Exposure to liability to third parties, particularly adverse parties, for acts performed in good faith necessarily undermines this obligation.  Thus, lawyers are generally immune to such claims, whether arising from conduct undertaken during litigation or based on advice provided in the transactional context.  *See E. Aaron Enters. v. Weil*, 2009 U.S. Dist. LEXIS 149849, *13-14 (E.D. Pa. May 20, 2009).  In granting the defendant attorney's motion to dismiss, the court in *Weil* held:

> The Weil Defendants argue that Plaintiff has failed to state a claim against them because, as alleged by Plaintiff, they "did nothing more than render advice to their client and inform Plaintiff of CIT's validly held and perfected security interest in Northwest's property." I agree….[A]ttorneys, in the proper exercise of their functions as such, [are] not [] liable to adverse parties for acts performed in good faith and for the honest purpose of protecting the interests of their clients…[T]he Weil Defendants were merely acting within the scope of their attorney-client relationship with CIT….In these circumstances, I am compelled to conclude that Plaintiff has failed to state a claim against the Weil Defendants.

*Id*. at *13-14 (citations omitted).  Similarly, in holding that an attorney was not liable for an intentional tort based on advice provided to his client, the court in *Smith* observed:

> The advice was given by an attorney to a client whom he represented in an acrimonious divorce action. The attorney's advice was that his client could enter what was formerly the marital home and remove personal property. Even if the advice had been intended to persuade appellant to agree to a property settlement, the attorney's motive was not improper; he was clearly acting in the interests of his client. For such advice there can be no liability to the adverse party.

476 A.2d at 27.  Here, like the plaintiffs in *Weil* and *Smith*, Simons seeks recovery for an intentional tort based on advice that Buchanan's gave to Brown in connection with Amendment II.  Buchanan was justified in providing this advice to Brown, having done so in good faith in the service of its client as a party adverse to Simons in that transaction.  Accordingly, for this additional reason, Count V should be dismissed.

## **CONCLUSION**

For all of the foregoing reasons, Defendant Buchanan Ingersoll & Rooney PC respectfully requests that this Court grant its motion and dismiss the Amended Complaint in its entirety and with prejudice.

Dated:  March 8, 2021

Respectfully submitted,

*/s/ Craig D. Mills*
Craig D. Mills (PA ID No. 81331)
Andrew G. Hope (PA ID No. 317932)
BUCHANAN INGERSOLL & ROONEY PC
Two Liberty Place
50 S. 16th Street, Ste 3200
Philadelphia, PA 19102
Tel:  (215 665-8700
Fax:  (215) 665-8760

*Attorneys for Buchanan Ingersoll & Rooney PC*

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served this 8th

day of March, 2021, upon counsel of record via the Court's ECF filing system.


*/s/ Craig D. Mills* _____

Craig D. Mills